Edge v. Edge.

---

JOHN EDGE, executor, appellant,

*v.*

JAMES EDGE, respondent.

In the summer of 1880, a testator, who was then eighty years old, received a sunstroke, which affected his mind seriously. In May, 1881, during an attack of *delirium tremens,* he fell out of a second-story window, and injured himself severely. He always insisted that he had been pushed out of the window by his wife's grandson, which was not a fact. He also labored under the delusion that his wife wanted to poison him, and that the persons in the house were trying to rob him. In June, 1881, he made a will, and in July,

1881, within two weeks thereafter, he made another, alleging, as a reason, that his son James, in whose custody he had placed the first will, had broken open the sealed envelope containing it, and had read it, which was not a fact. By the first will, a considerable gift was made to James; by the second, nothing was given to him. By the first, he gave $1,000 to John; by the last, nine-tenths of his property. By the first, bequests were made to some of testator's needy grandchildren, to whom, by the second, he gave nothing. The second will was executed while testator was living with his son John, who went with him to have it drawn; who, as before stated, received by its terms, nine-tenths of all the estate; who made statements to the testator that led him to suspect and believe that James had broken open the first will and read it, and in whose family testator lived from the time the second will was drawn until his death.—*Held*, that testator's extreme old age, his habits of intemperance and consequent delirium, his injuries from the sunstroke and the fall, his delusions towards his wife and step-grandson and son James, and his making two very different wills within two weeks, without assigning, and without there appearing to have been, any adequate reason therefor, are sufficient proof of testamentary incapacity.

On appeal from decree of Passaic orphans court, refusing to admit to probate a paper-writing purporting to be the last will of Thomas Edge, deceased.

*Mr. J. W. Griggs*, for appellant, the proponent, John Edge.

*Mr. E. Stevenson*, for respondent, the caveator, James Edge.

THE ORDINARY.

Thomas Edge, late of Passaic county, died September 11th, 1882, aged eighty-one years. At the time of his death, he had a wife and three living children, John, James and Elizabeth, also a child of a deceased daughter Ann and the children of another deceased daughter, Sarah Tracy. Between the 18th and the 25th of June, 1881, he made a will, drawn for him by Peter Ryle, a lawyer of Paterson, at the office of the testator's son James, in Little Falls township. At the testator's request, James sent for Mr. Ryle to come to the office to draw the will, and at the like request, he took him there to make it. The witnesses to it were Mr. Ryle and Joseph Sharp. After it was signed, the will was sealed up in an envelope, and at the testa-

tor's direction, left with James, who placed it in an iron safe in his office. It remained there until about the 4th of July following, when the testator called for and got it. On that day, he went with John to Mr. Ryle, in Paterson, and got the latter to draw another will, which he signed there, in the presence of Mr. Ryle and John H. Bogert, and the former will was then destroyed by Mr. Ryle, by his direction. The last will was enclosed by Mr. Ryle, in an envelope, which he sealed and handed to the testator, who, when he returned home, gave it to John for safe keeping. By that will, he gave to his wife, for life, a house and four lots of land on the Little Falls turnpike, and directed that, at her death, the property be sold ; and he gave two-thirds of the proceeds of sale to John and one-third to his daughter Elizabeth and his granddaughter Martha, daughter of Sarah Tracy. He gave, also, to his daughter Elizabeth, $1,000, and to his granddaughter Martha, $500. To Joseph Crompton he gave $50, in recognition of his kindness to him, and he then gave all the rest of his property to John, whom he appointed executor. His property was worth about $13,000. The provisions of the former will are not precisely known. Mr. Ryle says that will was more favorable to James than the last one (the last will gives James nothing), and he thinks it left property to children or descendants of children, whose names do not appear in the last will. Mr. Jackson testifies that the testator told him that he " made it as good as he thought it would be right and suitable—that would be right to the purpose to all his children." Mrs. Crompton testifies that he told her that he had given James something very handsome by his will, and added that one child was as good as another. He told David Dimmick that he had given John $1,000 by that will. Prior to the 15th of June, 1881, the testator and his wife lived in a house of his in the neighborhood of James's residence, and the latter attended to the testator's business. At James's request, John, who then lived at or near Belleville, in Essex county, took up his residence with the testator and his wife, to take care of them. On the 6th of June, shortly before that time, the testator executed a power of attorney, authorizing John to collect

Edge v. Edge.

the principal and interest, as they should become due, of his notes and bonds and mortgages, and draw his money from the savings bank. The testator and his wife continued to reside with John, paying board to him, up to the death of the former. The testator, in the summer of 1880, had a sunstroke, which appears to have seriously affected and injured his mental powers for a time, at least. In May, 1881, but a short time before he made his first will, he got out of the window of his bed-room, breaking out the sash, and fell on the roof of the kitchen (a shed), and thence to the stone pavement. This fall hurt him severely. To the end of his life, he insisted that his step-grandson, James Johnson, who then lived with him, and then was in the room with him for the purpose of taking care of him, pushed him out of the window. He also, about the same time, insisted that his wife had poisoned him, and he said that he believed that she and her grandson wanted to take his life, to get him out of the way. There was no ground for these charges, or any of them, but they appear to have been entirely the result of delusions on his part, and he persisted in making them as long as he lived. A short time after he fell, and before he recovered from the fall, so as to be able to go out of his room, he sent to a person who sometimes made up his accounts for him, and employed him to make an inventory of all his property in the house, giving as his reason, that the people in the house were robbing him and were carrying his property away. There was no ground for this statement, nor any reason for his apprehensions, but they also arose from delusion. The reasons for making the last will and changing the disposition of his property, appear to have been that he was convinced that James had broken open the envelope in which the first will was placed, and had read the instrument. This conviction seems to have been based on the circumstance that John had told him that James had said to him that he considered that John was $1,000 better off by moving his wife and family to his father's house. It is also alleged that the testator stated that he had heard that James's wife had said that she "did not care how things went now, as her bread was buttered on both sides." James had not broken open

the will at all, and did not know what its contents or provisions were. It is argued that he concluded that James had broken open his will because he could not otherwise have known what provision the testator had made therein for John. But it appears that the testator himself made no secret of that matter or any other of the dispositions of his whole estate, by that will. He told David Dimmick that he had given John $1,000 by it. Nor is there any evidence that James's wife had made the statement attributed to her, nor said anything to that or similar effect. It is urged on the part of the proponent, John, that the testator did not like her, and that he said that her family had been supported with his money; but his dislike to her, if it existed, and the fact, if it was such, that her family had been supported with his money (of which there is no evidence), existed when the first will was made, and they do not appear to have affected his disposition of his property then. Nothing had happened in that connection, between the making of the two wills, to furnish a reasonable ground for depriving James of a share of the testator's property. As to the alleged expression of the wife, before mentioned, there is not only no proof that she made it, but she positively swears that she never did so, and there is no evidence that he was ever told by any one that she had made it. That the testator's mind was enfeebled by old age, disease and habits of intemperance, there can be no question, and that he was under a delusion as to the malevolent disposition of his wife and her grandson towards him, is admitted. Both the physicians—Dr. Keeler, who attended him from the 8th of May, 1881, to the 6th of June following, and again in 1882, in his last sickness, and Dr. Gedney, who attended him in June, 1881—agree that when he had the fall, he had *delirium tremens.* The former testifies that when he was first called to him, which was when he fell out of the window, he found him suffering from that disease, the result of excessive alcoholism, and the latter says that when he was first called to him, which was early in June, when Dr. Keeler left the case, he found him suffering from that disease, and treated him for it, accordingly. Dr. Keeler says that the testator's mind, when he last saw him, in

May and June, 1881, seemed clear on all other subjects except that of the poisoning. Dr. Gedney says that the testator had the hallucinations most of the time that he attended him. As before stated, the delusions continued as long as he lived. In May, after he fell through the window, he left his own house and went to Mr. Crompton's house to board. He stayed there about two weeks. The reason he gave for coming there was that he could not stay in his own house, because he was afraid of being murdered by his wife and her grandson. He said he was going to Paterson to see a lawyer, to get a divorce from his wife. He was very old, and, as already appears, was of very intemperate habits. He was injured for a time, at least, by the sunstroke. He was very much injured by the fall out of the window, and was then suffering from *delirium tremens*, from excessive drinking. He naturally grew feebler as he advanced in life. His mental condition was manifestly such as to make him exceedingly susceptible to influence. Nothing in favor of the will is to be presumed from the fact that he lived for more than a year after it was made, and did not alter it or seek to do so, or express any dissatisfaction with it. He was living with John when he made the second will. It was John who took him to the lawyer to have it drawn and signed. It was John, the principal beneficiary under that will, who told him what led him to suspect and firmly believe that James had broken open the first will. The testator remained in John's family from the time the last will was made until he died, and he was in a feeble mental condition all the time. Nor is there any reasonable ground on which to account for the sudden change of purpose in the disposition of his property. Why should he, in two weeks' time, alter that disposition in favor of John from a gift of $1,000 to a gift of what amounts, it is said, to nine-tenths of his whole estate? What had happened between the making of the two wills, to induce him to cut James off entirely? If it be suggested that the fact that James would no longer attend to his affairs, while John was willing to do so, was a sufficient reason, the ready answer is that the power of attorney to John was given before the first will was made. When John came up to reside with the tes-

tator, it was understood and agreed that he was to receive adequate compensation for the board of the testator and his wife, and a written agreement was made between him and the testator to that effect, on the 15th of June, 1881, and John says another agreement was made between them on the 9th of July following (after the last will was made), that he was to receive $8 a week for their board. So that the charge was not made in view of the fact that John had undertaken to take care of the testator, for he was to be paid $8 a week for that; nor because he had undertaken to look after the testator's investments and collect his money for him, for that he had undertaken to do when the first will was made. The sole reason appears to have been the testator's conviction that James had broken open his will, of which I have spoken in a previous part of this opinion. It may be added that the testator does not appear to have been estranged from James, even by that conviction, for, in the summer of 1882, he borrowed money of James for his own accommodation. It is urged in favor of the will, that John was poor, while James was worth about $10,000, but the former had become no poorer nor the latter any richer, between the times when the two wills were made. Moreover, it appears that the testator's daughter Elizabeth was poor; to her he gives only $1,000 and one-sixth of the proceeds of the sale of the house and lots in which he gives his wife a life estate. Ann's daughter was poor, and Sarah's children all were very poor, except one. The sudden change of intention, without any reason which is apparently valid, or such as to control or influence a sound mind, is evidence of testamentary incapacity. It is true, Mr. Ryle, who had some acquaintance with the testator, says that he considered him competent when he signed the will in question, and Mr. Bogert, the other witness, from what he saw of him at the time of the execution of the instrument, regarded him as of sound mind. He, however, had never seen him before, and never saw him afterwards. As before stated, the testator, at the time when he made each of the wills, was laboring under an insane delusion in regard to his wife. She was entitled to just consideration in his testamentary disposition of his estate. His insane

delusion, just referred to, forbade it, or, at least, rendered it highly improbable that she would receive it. What provision he would have made for her had he not been possessed of the idea that she was seeking an opportunity to kill him, of course cannot be told. It is said (but there is no proof on the subject) that the provision made for her is entirely inadequate for her support. The fact of the testator's extreme old age, his habits of intemperance, the injuries which he had received by the sunstroke and the fall, the malady (*delirium tremens*) under which he was suffering at the time of the fall, the insane delusions which possessed his mind, his strange conduct which indicated derangement, the fact that his delusion as to his wife's malevolent and murderous disposition towards him, may reasonably be considered to have influenced him in his disposition of his estate, so far as she was concerned, and the fact that he made two wills within a few days of each other (the latter widely variant from the former), but for no reason worthy of the name, by the former of which he gave James a share of his property and John only $1,000, while by the latter he gave James nothing and John, as it is said, nine-tenths of his whole estate, wholly excluding needy grandchildren, whom he had remembered in his first will, to give them a share of his property—all these are considerations abundantly sufficient to induce me to affirm the decree of the orphans court, on the ground of want of testamentary capacity. It will be affirmed accordingly. The costs of both sides, both in this court and in the orphans court, with reasonable counsel fees, will be paid out of the estate.